LLOYD A. BOOKMAN (State Bar No. 89251)
E-Mail:  lbookman@health-law.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East, Suite 1600
Los Angeles, California  90067
Telephone: (310) 551-8111
Facsimile: (310) 551-8181

JOSEPH R. LAMAGNA (State Bar No. 246850)
E-Mail:  jlamagna@health-law.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
101 W. Broadway, Suite 1200
San Diego, California 92101-3890
Telephone: (619) 744-7300
Facsimile: (619) 230-0987

JORDAN KEARNEY (State Bar No. 305483)
E-Mail:  jkearney@health-law.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
575 Mark Street, Suite 2300
San Francisco, California 94105
Telephone: (415) 875-8500
Facsimile: (415) 875-8519

Attorneys for Providence Defendants

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* INTEGRA MED ANALYTICS LLC,<br><br>          Plaintiff,<br><br>     vs.<br><br>PROVIDENCE HEALTH & SERVICES, et al.,<br><br>          Defendants. | Case No. 2:17-cv-01694-PSG-SS<br><br>**Memorandum In Support of Defendants' Motion to Dismiss Second Amended Complaint**<br><br>(Notice of Motion and Motion to Dismiss, [Proposed] Order, and Joint Request for Judicial Notice filed concurrently)<br><br>The Hon. Philip S. Gutierrez<br><br>Date:      January 14, 2019<br>Time:      1:30 p.m.<br>Courtroom:   6A<br><br>Trial Date:      None Set |

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

## TABLE OF CONTENTS                                                      Page

I.      INTRODUCTION ...................................................................................8

II.     THE PLEADING STANDARD UNDER THE FCA ...................................10

III.    RELATOR'S ALLEGATIONS .................................................................10

IV.     THE PUBLIC DISCLOSURE BAR .........................................................13

        A.      Relator Has Repurposed Publicly Disclosed CMS Data For This
                *Qui Tam* Action.........................................................................14

        B.      Relator Is Not An Original Source.............................................18

V.      RELATOR'S ACTION FAILS UNDER RULES 9(b) AND 12(b)(6). .........22

        A.      Relator Fails To Plead Falsity...................................................24

        B.      An Invalid MCC That Does Not Impact Payment Is Not
                Material. ....................................................................................32

        C.      Relator's Allegations Give No Reasonable Inference That
                Providence Knowingly Submitted False Claims. ........................33

VI.     THE CONSPIRACY AND REVERSE FCA CLAIMS FAIL AS
        DERIVATIVE OF THE INADEQUATE FCA ALLEGATIONS. ................34

        A.      Relator Pleads No Facts To Support A Reverse FCA Claim. .............34

        B.      The Conspiracy Cause Of Action Should Be Dismissed Because
                Relator Fails To Allege Defendants Agreed To Violate The FCA. .....34

VII.    RELATOR'S INCOMPREHENSIBLE KICKBACK CLAIM
        SHOULD BE DISMISSED.....................................................................36

VIII.   CONCLUSION ....................................................................................37

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

5693857.2

| | **TABLE OF AUTHORITIES** | **Page** |

**Cases**

*United States ex rel. Aflatooni v. Kitsap Physicians Servs.*,
   163 F.3d 516 (9th Cir. 1998) .......................................................... 13, 18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................... 10, 13, 14, 33

*United States ex rel. Atkins v. McInteer*,
   470 F.3d 1350 (11th Cir. 2006) ............................................................ 30

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................... 10

*United States ex rel. Bennett v. Medtronic, Inc.*,
   747 F. Supp. 2d 745 (S.D. Tex. 2010)............................................ 23, 30

*U.S. ex rel. Biddle v. Stanford*,
   147 F.3d 821 (9th Cir. 1998) .............................................................. 22

*United States ex rel. Bledsoe v. Cmty. Health Sys.*,
   501 F.3d 493 (6th Cir. 2007) .............................................................. 30

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys.*,
   *637 F.3d 1047, 1056 (9th Cir. 2011)* ................................................... 28

*United States ex rel. Campie v. Gilead Scis., Inc.*,
   862 F.3d 890 (9th Cir. 2017) .............................................................. 24

*United States ex rel. Carter v. Bridgeport Educ., Inc.*,
   No. 10-cv-1401 JLS (WVG), 2015 U.S. Dist. LEXIS 108200 (S.D.
   Cal. Aug. 17, 2015) .......................................................................... 17

*United States ex rel. Conrad v. Abbott Labs., Inc.*,
   No. 02-11738-RWZ, 2013 U.S. Dist. LEXIS 26048 (D. Mass. Feb.
   25, 2013) .......................................................................................... 15

*U.S. ex rel. Crews v. NCS Healthcare of Ill., Inc.*,
   460 F.3d 853 (7th Cir. 2006) .............................................................. 25

*Durcholz v. FKW Inc.*,
   189 F.3d 542 (7th Cir. 1999) .............................................................. 35

*Feingold v. AdminaStar*,
   324 F.3d 492 (7th Cir. 2003) ........................................................ 15, 16

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

2:17-CV-01694-PSG-SS

5693857.2

Memorandum In Support of Defendants' Motion to Dismiss Second Amended Complaint

## TABLE OF AUTHORITIES                                                Page

*United States ex rel. Fine v. Chevron, U.S.A., Inc.*,
    72 F.3d 740 (9th Cir.1995) ................................................................... 22

*Harrison v. Westinghouse Savannah River Co.*,
    176 F.3d 776 (4th Cir. 1999) ................................................................ 24

*United States ex rel. Hastings v. Wells Fargo Bank, NA, Inc.*,
    656 Fed. Appx. 328 (9th Cir. 2016) ..................................................... 20

*United States ex rel. Hill v. Harvard Univ.*,
    2017 U.S. Dist. LEXIS 144371 (C.D. Cal. Aug. 31, 2017) ................. 20

*United States ex rel. Hong v. Newport Sensors, Inc.*,
    No. SACV 13-1164-JLS, 2016 U.S. Dist. LEXIS 188295 (C.D. Cal.
    May 19, 2016), *aff'd* 728 F. App'x 660 (9th Cir. 2018) ..................... 17

*Hooper v. Lockheed Martin Corp.*,
    688 F.3d 1037 (9th Cir. 2012) .............................................................. 28

*United States ex rel. Johnson v. Shell Oil*,
    183 F.R.D. 204 (E.D. Tex. 1998) ......................................................... 36

*United States ex rel. Kelly v. Serco, Inc.*,
    846 F.3d 325 (9th Cir. 2017) ................................................................ 28

*U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
    985 F.2d 1148 (2d Cir. 1993) ............................................................... 20

*United States ex rel. Lee v. Corinthian Colleges*,
    No. CV 07-1984 PSG, 2013 U.S. Dist. LEXIS 188352 (C.D. Cal.
    Mar. 15, 2013) ........................................................................................ 9

*Little v. Shell Exploration & Prod. Co.*,
    690 F.3d 282 (5th Cir. 2012) ................................................................ 22

*United States ex rel. Macias v. Pac. Health Corp.*,
    No. CV 12-00960-RSWL-AJWx, 2018 U.S. Dist. LEXIS 27891
    (C.D. Cal. Feb. 20, 2018) ..................................................................... 35

*Malhotra v. Steinberg*,
    770 F.3d 853 (9th Cir. 2014) ................................................................ 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

## TABLE OF AUTHORITIES

Page

*United States ex rel. Martinez v. Orange Cty. Global Med. Ctr., Inc.*,
No. 8:15-cv-01521-JLS-DFM, 2017 U.S. Dist. LEXIS 221085 (C.D.
Ca. Sept. 14, 2017) ...................................................................................... 32

*United States ex rel. Michaels v. Agape Senior Cmty., Inc.*,
No. 0:12-3466-JFA, 2015 U.S. Dist. LEXIS 82379 (D.S.C. June 25,
2015), *aff'd* 848 F.3d 330 (4th Cir. 2017) ................................................ 27

*United States ex rel. Modglin v. DJO Glob. Inc.*,
114 F. Supp. 3d 993, 1011 (C.D. Cal. 2015), *aff'd*, 678 F. App'x
594 (9th Cir. 2017) .................................................................. 10, 23, 27, 33

*United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*,
707 F.3d 451 (4th Cir. 2013) ...................................................................... 25

*United States ex rel. Paranich v. Sorgnard*,
396 F.3d 326 (3d Cir. 2005) ....................................................................... 22

*United States ex rel. Petratos v. Genentech Inc.*,
855 F.3d 481 (3d Cir. 2017) ....................................................................... 32

*Prather v. AT&T, Inc.*,
847 F.3d 1097 (9th Cir. 2017) ....................................................... 13, 20, 22

*United States ex rel. Rizzo v. Horizon Lines*,
No. CV 10-7409 PA, 2013 WL 12131171 (C.D. Cal. Oct. 28, 2013) ................ 35

*Rockwell Int'l Corp. v. United States*,
549 U.S. 457 (2007) ......................................................................... 18, 20

*Sams v. Yahoo! Inc.*,
713 F.3d 1175 (9th Cir. 2013) ................................................................... 13

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
563 U.S. 401 (2011) ....................................................................... 9, 14, 15

*Seal 1 v. Seal A*,
255 F.3d 1154 (9th Cir. 2001) ................................................................... 16

*United States ex rel. Silingo v. Mobile Med. Examination Servs.*,
No. SA CV 13-1348 FMO, 2015 U.S. Dist. LEXIS 186860 (C.D.
Cal. Sep. 29, 2015), *rev'd on other grounds*, 895 F.3d 619 (9th Cir.
2018) ........................................................................................................ 35

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

2:17-CV-01694-PSG-SS

5693857.2

## TABLE OF AUTHORITIES                                                    Page

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ...................................................................... 10, 26

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
    125 F.3d 899 (5th Cir. 1997) ............................................................................. 25

*United States ex rel. Unite Here v. Cintas Corp.*,
    No. C 06-2413 PJH, 2007 U.S. Dist. LEXIS 98776 (N.D. Cal. Dec.
    21, 2007) .......................................................................................................... 17

*United States v. Alcan Elec. & Eng'g, Inc.*,
    197 F.3d 1014 (9th Cir. 1999) .......................................................................... 20

*Calisesi ex rel. United States v. Hot Chalk, Inc.*,
    No. CV-13-01150-PHX-NVW, 2015 U.S. Dist. LEXIS 57509 (D.
    Ariz. May 1, 2015) ........................................................................................... 35

*United States v. Kernan Hosp.*,
    880 F. Supp. 2d 676 (D. Md. 2012) ........................................................... 17, 30

*United States v. Kinetic Concepts, Inc.*,
    No. CV 08-01885-BRO, 2017 U.S. Dist. LEXIS 221777 (C.D. Cal.
    Mar. 6, 2017) ................................................................................................... 34

*Ebeid ex rel. United States v. Lungwitz*,
    616 F.3d 993 (9th Cir. 2010) ........................................................ 10, 11, 12, 23

*United States v. Murphy*,
    937 F.2d 1032 (6th Cir. 1991) .......................................................................... 35

*Universal Health Servs. v. United States ex rel. Escobar*,
    136 S. Ct. 1989 (2016) ..................................................................................... 32

*W. Mining Council v. Watt*,
    643 F.2d 618 (9th Cir. 1981) ............................................................................ 10

*United States ex rel. Wall v. Vista Hospice Care, Inc.*,
    No. 3:07-cv-00604-M, 2016 U.S. Dist. LEXIS 80160 (N.D. Tex.
    June 20, 2016) .................................................................................................. 27

**Statutes**

5 U.S.C.
    § 552 ................................................................................................................. 22

**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

**TABLE OF AUTHORITIES**                              **Page**

31 U.S.C.
  § 3729 ................................................................................*passim*
  § 3730 ...................................................................... 13, 15, 17, 18

42 U.S.C.
  § 1320 ................................................................................ 8, 36
  § 3729 ...................................................................................... 24

**Other Authorities**

42 C.F.R. Part 421 .................................................................... 20

42 C.F.R. § 410.32 .................................................................... 28

45 C.F.R. Part 5b ...................................................................... 22

72 Fed. Reg. 47 ..................................................... 25, 30, 31, 32

**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

2      Defendants Providence Health & Services, Providence Health System –

3   Southern California, Providence Health & Services – Washington, Providence

4   Health & Services – Oregon, Providence Saint John's Health Center, Providence

5   Health & Services – Montana, Swedish Health Services, and Swedish Edmonds

6   (collectively, "Providence") respectfully submit this memorandum in support of the

7   motion to dismiss the Second Amended Complaint ("SAC") (ECF No. 38) of

8   Relator Integra Med Analytics LLC ("Relator" or "Integra").

9      Relator's SAC fails under Federal Rules of Civil Procedure 12(b)(6) ("Rule

10   12(b)(6)") and 9(b) ("Rule 9(b)") to state with particularity (1) its right to pursue

11   this False Claims Act ("FCA") lawsuit on behalf of the United States because of the

12   "public disclosure bar" and (2) the circumstances constituting fraud under the FCA,

13   31 U.S.C. § 3729(a)(1)(A)–(C), (G) and the federal Anti-Kickback Statute ("AKS")

14   42 U.S.C. § 1320a-7b(b).

15   **I.    INTRODUCTION**

16      The United States has declined to intervene in this FCA case.  Relator has

17   nevertheless chosen to continue its *qui tam* action even though the allegations in its

18   SAC fall woefully short of establishing its standing and stating a claim for relief

19   against Providence.

20      The inadequacy of Relator's substantive allegations is no accident.  Integra is

21   a classic parasitic relator.  Relator is not an insider.  It had no relationship or

22   interaction with Providence or with Providence's alleged contractor, J.A. Thomas

23   and Associates, Inc. ("JATA"; Providence and JATA collectively, "Defendants").

24   Instead, Relator is a for-profit data analytics company (SAC ¶ 10) that is attempting

25   to make a quick buck by using data from the Centers for Medicare and Medicaid

26   Services ("CMS") to allege fraud.  SAC ¶ 49.

27      However, where, as here, "the government is already in possession of

28   information regarding allegations or transactions…, no public benefit is derived

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

from permitting the private party to proceed with [an FCA action] unless that party was the source of the information," and the action should be dismissed pursuant to the FCA's public disclosure bar. *United States ex rel. Lee v. Corinthian Colleges*, No. CV 07-1984 PSG (MANx), 2013 U.S. Dist. LEXIS 188352, *10–11 (C.D. Cal. Mar. 15, 2013). Here, Relator's case is "a classic example of the 'opportunistic' litigation that the public disclosure bar is designed to discourage." *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 410 (2011). Any litigant having minimal knowledge of Medicare billing could have requested CMS data and performed the same analysis, especially a litigant that believes it could share the proceeds of any recovery and require a defendant pay its attorneys' fees.

Relator's case is an abuse of the *qui tam* provisions, which are designed to reward insiders, not vigilantes. If Relator's case is permitted to go forward, it would give rise to a cottage industry of serial relators filing claims to extort money from healthcare providers, including non-profits like Providence. Because of the high potential liability under the FCA and the high costs of litigating these cases, organizations would settle potentially meritless actions, diverting funds from patient care. The public disclosure bar exists to prevent this outcome. The Court should dismiss Relator's action under the FCA's public disclosure bar. Rule 12(b)(6).

Moreover, Relator's SAC fails to allege the particularized facts necessary to provide adequate notice to Defendants or to constitute a claim for relief under the FCA. Rule 9(b). In essence, Relator alleges its review of CMS data revealed that Providence billed for certain conditions more often that Relator would expect when comparing to other hospitals. Relator speculates that, as a result, some of those claims *must* be fraud and theorizes about the mechanisms by which JATA and Providence could have encouraged overutilization. In making the general conclusion, Realtor cannot point to any specific claims with any specific facts or explanation as to why they result in an overpayment. Rule 9(b) does not allow a plaintiff to rely on speculation and theories to support a fraud claim.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

## II.    THE PLEADING STANDARD UNDER THE FCA

A motion to dismiss under Rule 12(b)(6) tests whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When deciding a Rule 12(b)(6) motion, the Court must accept the facts pleaded in the complaint as true. The Court, however, is not required to accept "legal conclusions…cast in the form of factual allegations." *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981); *see also Iqbal*, 556 U.S. at 678 (pleadings that "are no more than conclusions…are not entitled to the assumption of truth."); *Twombly*, 550 U.S. at 555.

The heightened pleading standard of Rule 9(b) applies to FCA actions. "Rule 9(b) serves to give defendants adequate notice to allow them to defend against the charge and to deter the filing of complaints as a pretext for the discovery of unknown wrongs…" *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) (citations omitted). To satisfy Rule 9(b), Relator must "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged." *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (citations omitted); *United States ex rel. Modglin v. DJO Glob. Inc.*, 114 F. Supp. 3d 993, 1011 (C.D. Cal. 2015), *aff'd*, 678 F. App'x 594, 595 (9th Cir. 2017) (a relator must "specify the content of the fraudulent representation, the person who made it, when and where the representation was made, and the manner in which it was untrue and misleading, or the circumstances indicating that it was false.") Relator must allege "particular details of a scheme to submit false claims..." *Ebeid*, 616 F.3d at 998–99.

## III.    RELATOR'S ALLEGATIONS

For a 100-page complaint, Relator has alleged very little because Relator knows very little. Relator is not a Providence or a JATA insider. Relator is a for-profit data analytics firm in Texas that crunched claims data from CMS (SAC ¶ 49)

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

until it found a hospital to sue to test its theory.  After reviewing Relator's allegations, the Government has declined to intervene in this litigation.

Providence is a system of 34 non-profit hospitals.  SAC ¶¶ 1, 12–19. Providence hospitals billed claims to Medicare for inpatient hospital services, which are paid based on the Medicare Severity Diagnosis Related Group ("MS-DRG") system.[1]  SAC ¶ 21.  Under this system, a hospital receives a standard payment for each discharge based on the patient's primary diagnosis, which is sometimes adjusted if the patient has one or more secondary diagnoses that qualify as complications and comorbidities ("CC") or major complications and comorbidities ("MCC").  SAC ¶ 21.  There are, then, up to three payment rates for each primary diagnosis:  non-CC, CC, and MCC.  *Id.*

Relator alleges that its analysis showed that claims from Providence included three MCCs – for encephalopathy, respiratory failure, and severe malnutrition – at a higher rate than Relator would expect based exclusively on Relator's review of allegedly comparable claims data from other hospitals.  SAC ¶ 55.  Relator alleges (incorrectly as a matter of law) that adding an MCC always increases hospital reimbursement. SAC ¶ 122, n. 30.  Relator speculates, therefore, that Providence must have inflated its use of the three MCCs to increase reimbursement, rendering an unidentified portion of  those claims false.  *Id.*

Importantly, Relator makes no allegation that it has had any interaction with Providence patients or has reviewed any of Providence's medical charts.  It *speculates* that some of the charts would not support the billed MCC, but it does not *know* that they would not.

Relator also theorizes about the mechanisms by which Providence could have encouraged overutilization.  Relator focuses on JATA, a consultant that specializes

---

[1] For a more detailed summary of the MS-DRG system, *see* Defendant JATA's Memorandum in Support of Motion to Dismiss ("JATA MTD"), Section A.1, incorporated herein by reference.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

in helping hospitals develop their clinical documentation improvement ("CDI") programs to "ensure the accuracy of clinical documentation reflecting the appropriate severity of illness." SAC ¶ 24. Most hospitals have a CDI program, which consists of trained clinicians (usually registered nurses) who review medical records to ensure documentation is adequate to support a claim and that diagnoses that were treated are properly billed. *Id.* These "clinical documentation specialists" are essentially translators, who "bridge potential gaps between coding standards and commonly used clinical language." *Id.*

One way that a CDI program ensures that medical records adequately support a claim is by issuing "queries" to physicians to request additional documentation or clarify ambiguities. Relator alleges that Providence's queries were not "Medicare-compliant." SAC, n. 6. However, there are no Medicare statutes or regulations on queries or on CDI programs more generally, and Relator cites to none.

Relator's SAC is long, but its pages are filled with irrelevant data analyses. For example, in paragraphs 82–120 (for 32 pages), Relator argues against various "alternative hypotheses" (SAC § IV.D.2) that could explain why Providence might have higher than average utilization for three MCCs. That Relator cannot think of an alternative hypothesis, of course, does not mean it pleaded fraud. Relator does not address any hypotheses that would require a claims-level review of the data, such as systematic underreporting of a diagnosis in other hospitals or the fact that "natural variation is usage rates among hospitals is expected." SAC ¶ 51.

Many other allegations have nothing to do with Providence, including summaries of billing patterns at a non-Providence hospital (SAC ¶¶ 47–48, Fig. 2), quotes from non-Providence affiliates on an online forum (SAC ¶¶ 36–37, 45), and allegations based on JATA's "reputation" (*see, e.g.,* SAC ¶¶ 45–46, 31, 34–35, 40).

Perhaps more important than what Relator alleges is what Relator fails to allege. Relator's 100-page SAC does not name a single Providence affiliate said to be involved in the scheme. Relator points to no documents or emails memorializing

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

an expansive Medicare fraud.  It has not alleged it reviewed any patient charts or has any information on whether any individual patient had the MCC that was coded.  It cannot identify a misrepresentation on a single claim.  Relator does not identify a single physician who documented a diagnosis that did not exist, a single coder who included an MCC on a Medicare claim improperly, or a single claim where an MCC was improperly included because a specific physician was pressured by a specific Providence employee to include the MCC.   Relator's unsupported conclusion of fraud cannot be accepted on a motion to dismiss.  *Iqbal*, 556 U.S. at 678.

Relator's threadbare allegations do not begin to satisfy the requirements of Rule 9(b), as will be addressed in Section V below.  However, it will not be necessary for the Court to reach the sufficiency of Relator's allegations because Relator's  SAC is barred by the public disclosure bar.

## IV.    THE PUBLIC DISCLOSURE BAR

Under the FCA's public disclosure bar, a court "shall dismiss" an action if it is based on information already disclosed publicly unless the relator is an "original source" of the information.  31 U.S.C. § 3730(e)(4)(A).[2]  The public disclosure bar prevents parasitic relators from sharing in the government's recovery and profiting off of information already in the public domain.  "The purpose of the FCA is to encourage individuals with true 'knowledge' of alleged wrongdoing to come forward and provide such information to the Government, the purposes of the Act would not be served by allowing a relator to maintain a *qui tam* suit based on pure speculation or conjecture."  *United States ex rel. Aflatooni v. Kitsap Physicians Servs.*, 163 F.3d 516, 526 (9th Cir. 1998).

Here, Relator has no inside knowledge, and its case is barred.  Relator alleges

---

[2] The public disclosure bar is now an affirmative defense.  *Prather v. AT&T, Inc.*, 847 F.3d 1097, 1103 (9th Cir. 2017).  An affirmative defense "may be considered properly on a motion to dismiss where the allegations in the complaint suffice to establish the defense."  *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) (citations omitted).

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

no affiliation or interactions with Providence whatsoever.[3]  It is a for-profit data analytics firm (SAC ¶ 4) that "obtained data from the CMS"[4] (SAC ¶ 49), crunched CMS's numbers, and seeks to reap a windfall in this *qui tam* action.  Relator's case is what the Supreme Court warned against:

> [Relator's case is] a classic example of the "opportunistic" litigation that the public disclosure bar is designed to discourage…[A]nyone could have filed the same FOIA requests and then filed the same suit. Similarly, anyone could identify a few regulatory filing and certification requirements, submit FOIA requests until he discovers a federal contractor who is out of compliance, and potentially reap a windfall in a *qui tam* action under the FCA.

*Schindler Elevator*, 563 U.S. at 410 (2011) (citations omitted).  Relator has made no meaningful contribution to the Government's information about this matter, and its claim should be dismissed without leave to amend.

### A.    Relator Has Repurposed Publicly Disclosed CMS Data For This *Qui Tam* Action.

"The public disclosure bar is triggered if three things are true: (1) the disclosure at issue occurred through one of the channels specified in the statute;

---

[3] Relator's allegations regarding the public disclosure bar are limited to its legal conclusions that the bar does not apply and that Relator is an original source (SAC ¶ 9), which the Court need not accept as true. *Iqbal*, 556 U.S. at 678.

[4] Relator's access to and use of CMS's data is suspect here.  According to public filings, the Relator, Integra Med Analytics LLC was registered with the Texas Secretary of State on February 1, 2017, which is 29 days before the Relator filed a complaint in this case.  Providence doubts that Relator requested data from CMS, analyzed it, picked a hospital to sue, found a lawyer, made a voluntary disclosure to the Government, drafted a complaint, found local counsel, and filed a complaint in 29 days.

1   (2) the disclosure was 'public'; and (3) the relator's action is 'based upon'[5] the

2   allegations or transactions publicly disclosed." *Malhotra*, 770 F.3d at 858.  Here, all

3   three elements are satisfied, and the Court must dismiss the action unless Relator

4   proves it is an original source of the information.

5                       1.    Relator Obtained Its Data "From The CMS."

6        As Relator succinctly summarizes in Paragraph 49 of its SAC, Relator's case

7   is based upon data from a federal report that CMS publicly disclosed to Relator:

8              Relator uncovered Providence and JATA's fraud by

9              employing unique algorithms and statistical processes to

10             analyze inpatient claims data…**obtained from the CMS**.[6]

11  (emphasis added).  A "federal report" is a public disclosure that triggers the bar.  31

12  U.S.C. § 3730(e)(4)(ii).  Data obtained from CMS constitutes a "federal report."

13  *Schindler Elevator*, 563 U.S. at 410 (2011) (an agency response to a FOIA request

14  falls within the ordinary meaning of "report" and triggers the bar); *see also Feingold*

15  *v. AdminaStar*, 324 F.3d 492, 496 (7th Cir. 2003) (a report from CMS (then called

16  HCFA) was a public disclosure because it was a report issued by a federal agency);

17  *United States ex rel. Conrad v. Abbott Labs., Inc*., No. 02-11738-RWZ, 2013 U.S.

18  Dist. LEXIS 26048 (D. Mass. Feb. 25, 2013) (data files available to the public on

19  CMS's website were a federal report).

_____

21       [5] A previous version of the statute required allegations were "based upon" a
22  public disclosure to trigger the bar, and the current version requires allegations are
    "substantially the same" as a public disclosure.  Before the amendments, the Ninth
23  Circuit interpreted the "based upon" standard to require the allegations are
24  "substantially similar" to publicly disclosed information.  *Malhotra v. Steinberg*,
    770 F.3d 853, 858 (9th Cir. 2014).  The standard, then, is largely the same.

25       [6] As addressed in Section V below, Relator's complaint is devoid of detail,
26  including any information about what CMS data it has reviewed, which is fatal
    under Rule 9(b).  While Relator should not be granted leave to amend, if such leave
27  is granted Relator must plead the exact source of the data to allow Providence to
28  evaluate the original source issue further.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

The other two elements are also easily satisfied.  CMS's disclosure of its data to Relator is a public disclosure, at least as to Relator.  *Seal 1 v. Seal A*, 255 F.3d 1154, 1162 (9th Cir. 2001) ("Disclosure of information to one member of the public, when that person seeks to take advantage of that information by filing an FCA action, is public disclosure.").  Relator's analysis is based upon or substantially the same as the publicly disclosed information.  By Relator's own admission, it "uncovered the fraud" by analyzing CMS's data.  SAC ¶ 49.  CMS's data is the core of the SAC; without CMS data, there is no SAC.

Relator has done CMS no favors by alerting it to its own data.  "Because the purpose of a public disclosure is to alert the responsible authority that fraud may be afoot, and that purpose is served where that authority has itself issued the reports containing information that substantiates an allegation of fraud, those agency reports are publicly disclosed."  *Feingold*, 324 F.3d at 496 (citations omitted).

       2.    <u>Relator's Kwashiorkor Allegations Were Publicly Disclosed.</u>

Relator's reliance on CMS's data is enough to trigger the public disclosure bar without any additional disclosures.  However, several additional disclosures underscore just how little Relator has added to the Government's information.

For example, Relator repeatedly refers to kwashiorkor (SAC ¶¶ 27, 28, 75, 76, 81; *id.* n. 11) and cites the diagnosis as its sole example for its argument that JATA's "documentation tips often bore no relation to the clinical realities facing Providence doctors."  SAC  ¶ 27.  However, Relator's allegations regarding kwashiorkor mirror allegations in federal report from the Office of the Inspector General ("OIG") about a Providence facility's billing practices for kwashiorkor.  OIG, *Providence Portland Medical Center Incorrectly Billed Medicare Inpatient Claims with Kwashiorkor* (2014)*, available at* https://oig.hhs.gov/oas/reports/ region3/31300034.pdf (Defendants' Joint Request for Judicial Notice ("RJN"), Ex. 10) ("OIG Kwashiorkor Report.").  In that report, OIG summarized its review of Providence Portland's claims for kwashiorkor and found that, of the 90 claims that

1    the OIG determined were improperly coded, only three impacted the DRG payment.

2        Relator also ignores a subsequent OIG report, which found that the industry-

3    wide misuse of the code for kwashiorkor from 2006-14[7] was due to an error, which

4    led to a "discrepancy between the tabular list and the alpha index."  OIG, *CMS Did*

5    *Not Adequately Address Discrepancies in the Coding Classification of Kwashiorkor*

6    (2017),[8] p. 5, *available at* https://oig.hhs.gov/oas/reports/region3/31400010.pdf

7    (RJN, Ex. 31).  Though, in the tabular list of diagnosis codes, code 260 was only for

8    kwashiorkor, in the alphabetical index, code 260 corresponded to several diagnoses,

9    including kwashiorkor, malnutrition (calorie) malignant, malnutrition (calorie)

10   protein, protein deficiency, and protein malnutrition.  This error resulted in the

11   inadvertent incorrect coding of code 260 across the industry.  The OIG report

12   faulted CMS for failing to identify or respond to the issue.  Both of these publicly

13   disclosed OIG reports trigger the public disclosure bar.[9]

14        3.    Relator's Information About CDI Is From The Internet.

15        Relator relies heavily on public comments on an online forum and other

16   websites for its allegations about JATA's business practices and Providence's CDI

17   program.  *See* JATA MTD, Sec. III.B, "JATA's Business Practices," incorporated

18   herein by reference.  Websites and public comments on websites constitute "news

19   media" and trigger the public disclosure bar.[10]  Here, Relator used CMS data to find

20   a hospital system to sue, the perused the internet to tell a good story.  Relator's

---

21        [7] All of the claims for kwashiorkor that Relator baldly concludes are false are

22   from this time period.  SAC, Tab. 9.

23        [8] Though Relator's original complaint predates November 2017, that

24   complaint remains under seal, and Providence has not been able to review it.  To the
     extent the kwashiorkor allegations were added in amendments after November

25   2017, this OIG report would constitute an additional public disclosure.

26        [9] An FCA action (*United States v. Kernan Hosp.*, 880 F. Supp. 2d 676, 688

27   (D. Md. 2012)) alleging inappropriate coding for kwashiorkor serves as an
     additional public disclosure of these allegations.  31 U.S.C. § 3730(e)(4)(A)(i) (civil

28   hearing in which the government is a party is a public disclosure).

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1  information is substantially the same as public disclosures.

2  **B.  Relator Is Not An Original Source.**

3  Because there have been prior public disclosures, Relator has the burden of

4  proving it was an original source.  To be an original source, Relator must establish

5  that it "has knowledge that is independent of <u>and</u> materially adds to the publicly

6  disclosed allegations or transactions" <u>and</u> it "has voluntarily provided the

7  information to the Government before filing an action under [the FCA]."  31 U.S.C.

8  § 3730(e)(4)(B).  Relator has satisfied neither requirement.

9  1.    Relator Has No Independent Knowledge

10  That Relator, a third-party data analytics firm, has no independent knowledge

11  of its allegations is readily apparent.  To have independent knowledge, the Relator

12  would have had to know about the alleged fraud before the public disclosures.

13  *Aflatooni*, 163 F.3d at 525 (relator had independent knowledge because his

14  knowledge preceded the public disclosure).

15  Further, Relator has no independent knowledge because its allegations are

16  based on speculation rather than actual knowledge.  In *Rockwell*, the relator was a

17  former employee who predicted that there would be problems with the "pondcrete"

18  that his employer was creating pursuant to a government contract.  *Rockwell Int'l*

19  *Corp. v. United States*, 549 U.S. 457, 467–68 (2007).[11]  After he left his job,

20

21  [10] *United States ex rel. Hong v. Newport Sensors, Inc.*, No. SACV 13-1164-

22  JLS (JPRx), 2016 U.S. Dist. LEXIS 188295, at *14-15 (C.D. Cal. May 19, 2016),

23  *aff'd* 728 F. App'x 660, 662–63 (9th Cir. 2018) ("Information publicly available on the Internet generally qualifies as news media."); *see also United States ex rel.*

24  *Carter v. Bridgeport Educ., Inc.*, No. 10-cv-1401 JLS (WVG), 2015 U.S. Dist.

25  LEXIS 108200, at *6 n.4 (S.D. Cal. Aug. 17, 2015) (an "online comment…qualifies as a public disclosure as news media."); *United States ex rel. Unite Here v. Cintas*

26  *Corp.*, No. C 06-2413 PJH, 2007 U.S. Dist. LEXIS 98776, at *14 (N.D. Cal. Dec.

27  21, 2007) (a fact was "publicly disclosed in the news media, as that information was available on the Internet.")

28  [11] *Rockwell* analyzed a prior version of the statute, which required direct and

1  different issues with the pondcrete developed and were publicly disclosed, and the

2  relator filed suit, arguing he was an original source.  The Supreme Court disagreed,

3  finding that, because the Relator no longer worked at Rockwell at the time of the

4  failure, he did not actually know about the issues or how the company handled them.

5  The relator "did not *know* that the pondcrete failed; he *predicted* it."  *Id.* (emphasis

6  in original).  This was not enough to qualify him as an original source.

7      Similarly, in *Prather*, the relator was a former U.S. Attorney who alleged

8  telephone companies were inappropriately inflating charges for wiretapping.  *Prather*,

9  847 F.3d at 1104.  Relator contended he had knowledge of the alleged fraud based

10 on his review of invoices, knowledge of average wiretap charges, experience setting

11 investigation budgets, comparison of earlier and current invoices, conversations

12 with another telephone company about the subject, conversations with government

13 technology personnel, and participation in relevant conferences.  *Id.* at 1104.  The

14 court upheld the district court's determination that this was not enough; Prather

15 *speculated* that the  telephone company was gauging the prices because the prices

16 were increasing, but he had no actual *information* to support it.  *Ibid.*

17     Each of these cases has something in common:  The relator was an outsider

18 who pieced together bits of publicly disclosed information to speculate the existence

19 and mechanisms of fraud.  Relator is in the same position.  Relator has no

20 relationship to Providence but believes Providence submits too many of certain

21 claims.  Relator suspects this is evidence of fraud and predicts that the influence of

22 CDI is the mechanism of the fraud.  Like the relator in *Rockwell*, Integra does not

23 *know* that fraud is occurring or that Providence's CDI team is causing it, it *predicts*

24

25 independent knowledge instead of the current requirement that the knowledge be
   independent and materially add to publicly disclosed information.  However, the
26 Ninth Circuit has applied the same standard to a post-amendment case.  *United*
27 *States ex rel. Hastings v. Wells Fargo Bank, NA, Inc*., 656 Fed. Appx. 328, 331-332
   (9th Cir. 2016) (holding relator was not an original source because the "2010 FCA
28 amendments require knowledge, but [relator] provide[s] only speculation").

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1    that it is.  Like the relator in *Prather*, Integra *speculates* foul play, but it has no

2    actual *information* to support its theory.  Because Relator has no independent

3    knowledge, it is not an original source, and its action must be dismissed.

    2.   Relator's "Proprietary" Analysis Of CMS's Data Did Not

        Materially Add To What The Government Already Knew.

6    Relator does not qualify as an original source because, at most, its

7    "investigation merely added a legal name to describe the alleged circle of facts."

8    *United States v. Alcan Elec. & Eng'g, Inc.*, 197 F.3d 1014, 1020 (9th Cir. 1999); *see*

9    *also Hastings* at 331–32 ("Allegations do not materially add to public disclosures

10    when they provide only background information and details relating to the alleged

11    fraud-they must add value to what the government already knew.")

12    The fact that Relator analyzed CMS's data and pulled together internet

13    research does not grant it status as an original source.  "Regardless of the amount of

14    work performed by Relator, identifying the legal consequences of information

15    already in the public domain does not constitute discovery of fraud."  *United States*

16    *ex rel. Hill v. Harvard Univ.*, 2017 U.S. Dist. LEXIS 144371, *4-5 (C.D. Cal. Aug.

17    31, 2017); *see also U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985

18    F.2d 1148, 1159 (2d Cir. 1993) (holding that "some collateral research and

19    investigations…as would be customary in [FCA] litigation, does not establish" that

20    the relator is an original source).

21    Not even Relator's data analysis can be said to be an aid to the Government.

22    The Government is perfectly capable of doing its own data analyses, and it carefully

23    selects the contractors it engages to perform these efforts.  Medicare awards

24    contracts to intermediaries to pay claims (Medicare Administrative Contractors),

25    auditors to review claims (Recovery Audit Contractors, Comprehensive Error Rate

26    Testing contractors, and Supplemental Medical Review Contractors), and integrity

27    contractors to monitor for fraud (Zone/Unified Program Integrity Contractors).  *See,*

28    *generally,* 42 C.F.R. Part 421.  These contractors complete statistical analyses of

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1  Medicare claims data to determine audit priorities.  CMS, *Program Integrity*

2  *Manual* (hereinafter, "PIM"), Pub. 100-08, Ch. 2 – Data Analysis (rev. June 22,

3  2016), *available at* https://www.cms.gov/Regulations-and-

4  Guidance/Guidance/Manuals/Downloads/pim83c02.pdf (RJN, Ex. 32).[12]  CMS also

5  contracts to issue "Programs to Evaluate Payment Patterns Electronic Reports"

6  ("PEPPER Reports"), which are reports issued to providers, including hospitals, that

7  give provider-specific statistical analysis of claims data.  *See* CMS, Compliance

8  Projects, https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-

9  Programs/Medicare-FFS-Compliance-Programs/Data-Analysis/index.html (last

10  visited Oct. 16, 2018) (RJN, Ex. 33).  Finally, OIG also uses data analytics to

11  determine which entities to audit or investigate.  *See, e.g.,* OIG Kwashiorkor Report

12  (noting the analysis is based on review of CMS claims data).

13       Relator's work to analyze Providence's data is duplicative of the

14  Government's own analyzing the same data.  Because Relator is not a CMS

15  contractor, its analysis is also unmoored from CMS guidelines on the topic.  Relator

16  did not materially add to what the Government already knew.

17            3.    Relator Cannot Voluntarily Disclose CMS's Data To CMS.

18       Because Relator fails the first prong of the original source analysis, the Court

19  need not consider whether Relator made a voluntary disclosure.  Nonetheless, the

20  SAC fails here, as well.  Relator pleads no facts to support it made a voluntary

21  disclosure except its conclusory statement that it did so.  SAC ¶ 9.

22       Further, even if Relator made a disclosure to the Government, the disclosure

23  could not be "voluntary" as a matter of law.  Relator provides no detail about its

24

25  _____

26       [12] CMS has a series of "Internet Only Manuals," including the PIM, which

27  provide sub-regulatory guidance to the contractors that administer the Medicare
program.  The PIM provides instructions for how the contractors are to monitor for

28  fraud and abuse.  Chapter 2 details how contractors are to use data analytics.

1  data, other than to say it obtained it from CMS.[13]  However, when CMS grants

2  access to data, CMS retains ownership rights to that data and retains an interest in

3  any analysis that relies on that data.  Relator, then, had a preexisting obligation to

4  share its analysis with CMS.  A relator cannot voluntarily disclose information to

5  the government when it has a preexisting obligation to share it with the

6  government.[14]

7  ## V.    RELATOR'S ACTION FAILS UNDER RULES 9(b) AND 12(b)(6).

8          This is an FCA action that alleges Providence submitted more claims for

9  certain diagnoses than Relator's statistical model predicts.  Some of these claims,

10  Relator speculates, must be for patients who did not actually have those diagnoses,

11  though Relator has no information about the correct diagnoses for any patients.

12          Relator's speculation does not satisfy Rule 12(b)(6) or the heightened

13  pleading standard of Rule 9(b), which requires Relator to "specify the content of the

14  fraudulent representation, the person who made it, when and where the

---

16  [13]  As is apparent in Relator's Tables 3, 6, and 9, which list the "Beneficiary
17  ID" (*i.e.*, social security number), age, gender, race, and other information for
   various patients, Relator has access to protected health information ("PHI").  Under
18  the Privacy Act, CMS is prohibited from releasing PHI except in certain specified
   circumstances.  5 U.S.C. § 552a(b).  For example, CMS could release data "to carry
19  out specific research, solely for the purpose of carrying out such research."  45
   C.F.R. Part 5b, App. B; 5 U.S.C. § 552a(e)(4)(D).  CMS uses Data Use Agreements,
20  which impose criminal sanctions for converting data for an alternative purpose, to
21  ensure recipients only use CMS data for the intended purpose.

22  [14]  *See, e.g., United States ex rel. Fine v. Chevron, U.S.A., Inc.*, 72 F.3d 740
23  (9th Cir.1995) (relator's employment for the government obligated him to disclose
   fraud, so he could make no voluntary disclosure); *U.S. ex rel. Biddle v. Stanford*,
24  147 F.3d 821 (9th Cir. 1998) ( had a duty to disclose fraud to his employer, so
   disclosure was not voluntary); *Prather*, 847 F.3d 1097 (disclosure was not voluntary
25  where relator's employer asked him to submit an affidavit on the topic to support a
26  relevant regulation); *United States ex rel. Paranich v. Sorgnard*, 396 F.3d 326 (3d
   Cir. 2005) (disclosure pursuant to a subpoena was not voluntary); *Little v. Shell
27  Exploration & Prod. Co.*, 690 F.3d 282 (5th Cir. 2012) (government auditors were
28  compelled to disclose fraud, so disclosure was not voluntary).

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

representation was made, and the manner in which it was untrue and misleading, or the circumstances indicating that it was false." *Modglin*, 114 F.Supp.3d at 1015.

Relator cannot plead a misrepresentation because Relator knows nothing about Providence's patients. Relator has not alleged that it saw a single patient or reviewed a single medical record. To allege that Providence misrepresented a patient's condition, Relator would have to allege that the patient's actual condition differed from what was billed. Relator can make no such allegations because it has no such knowledge. Relator cannot state a claim under the FCA without particularly alleging how the information submitted on claims differed from reality.

Relator also fails to identify who allegedly orchestrated or implemented the alleged scheme. "In a fraud action against a corporation, a plaintiff must allege the names of persons who made the allegedly fraudulent misrepresentations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written." *Modglin*, 114 F.Supp.3d at 1015 (citations omitted); *see also United States ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 781–83 (S.D. Tex. 2010) (dismissing complaint alleging that a drug manufacturer coached hospitals to upcode because relator did not identify any physician or hospital that used an improper code). Here, Relator fails to identify a single Providence affiliate who engaged in misconduct or a single physician who went against her own medical judgement to diagnose a patient with a condition she did not have. Relator has failed to allege the "who" for the fraud. *Ebeid*, 616 F.3d at 998.

The SAC is similarly devoid of information as to when, where, and how the allege fraud occurred. Besides alleging the conduct occurred from 2011 through the present (*i.e.,* during the entire period not barred by the statute of limitations), Relator provides no information as to when the scheme was developed or implemented. SAC ¶ 49. Relator also offers no information as to which Providence hospitals were involved or how Providence managed to coordinate hospitals in different health systems across several states to implement the same scheme.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

Rule 9(b) screens fraud actions, like this one, "in which all the facts are learned through discovery after the complaint is filed." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 789 (4th Cir. 1999). Relator should not be allowed to initiate a fishing expedition to determine *if* Providence violated the FCA. Relator's action should be dismissed.

### A.    Relator Fails To Plead Falsity.

An entity violates the FCA when it "knowingly presents…a false or fraudulent claim for payment." 42 U.S.C. § 3729(a)(1). The "essential elements of [FCA] liability are: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 902 (9th Cir. 2017). Here, the first and most important reason that Relator's action fails is that Relator has not pleaded that Providence's claims were false.

> 1.    Statistical Analysis of Claims Data Does Not Establish Falsity.
>
> a.    Relator's statistical analysis is too speculative to survive a Rule 9(b) motion.

Relator's central allegation is that Providence had a statistically significant higher incidence of coding for three MCCs than other hospitals. From this, Relator makes the inferential leap that the claims that use those codes are fraudulent. This lack of a claim-specific analysis is fatal to its complaint. Medical services are, by their very nature, individualized. At issue, here, is whether individual people had the specific illnesses for which Providence billed. Relator speculates that some of them did not, though Relator offers no facts as to which ones are errors. Rule 9(b) prohibits such speculative allegations.

If true, all Relator's statistical allegations show is that Providence coded three MCCs more frequently than other hospitals, and that the higher occasion of coding is not explained by various statistical factors Relator analyzed. It is faulty logic to argue that a provider was committing fraud because it was at the high end of a

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1    distribution curve.  This does not establish that a single claim was coded improperly.

2    Rather, Relator's statistical allegations could be true and at the same time every

3    single claim submitted by Providence could have been coded correctly.[15]

4         A statistical analysis without any claims-level factual allegations is too

5    speculative to survive Rule 9(b).  In *Thompson*, the Fifth Circuit upheld the

6    dismissal of a complaint that alleged that "based on statistical studies performed by

7    the Government and others, approximately 40 percent of claims submitted by

8    defendants for services in violation of the anti-kickback statute or the Stark laws

9    were for services that were not medically necessary."  *United States ex rel.*

10   *Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997).

11   The Relator provided no analysis of individual claims.  The Court found that,

12   because Relator "provided no factual basis for his belief that defendants submitted

13   claims for medically unnecessary services other than his reference to statistical

14   studies," his allegations "amount[ed] to nothing more than speculation, and thus

15   fail[ed] to satisfy Rule 9(b)."  *Ibid.*; *see also United States ex rel. Nathan v. Takeda*

16   *Pharm. N. Am., Inc.*, 707 F.3d 451, 459 (4th Cir. 2013) (upholding the district

17   court's refusal to "draw an implausible inference linking general statistics" to allege

18   false claims were actually submitted); *U.S. ex rel. Crews v. NCS Healthcare of Ill.,*

19   *Inc.*, 460 F.3d 853, 856 (7th Cir. 2006) (same).

20        Relator's SAC contains the same fatal flaw.  Relator relies on an aggregate-

21   level allegation of overutilization to establish falsity of individual claims.  As a

22   result, Providence is not on notice as to what Relator suggests was false about the

23   _____

24        [15] For example, it could be that many other hospitals failed to properly
25   document and code MCCs, and thus underreported MCCs on their claims.  As CMS
     acknowledged in the Preamble to the Final Rule adopting the MS-DRG system, it
26   suspects hospitals are "leaving money on the table" when they do not "take
     opportunities to improve documentation and coding."  Medicare Program; Changes
27   to the Hospital Inpatient Payments and Fiscal Year 2008 Rates, 72 Fed. Reg. 47,130,
28   47,182.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

claims that were actually submitted.  Among other things, Relator has not alleged:

- Which claims are false.
- How Relator separated valid claims from invalid claims.
- What was wrong with individual claims.  For example, did the coders code conditions that the physicians did not document?  Did physicians document conditions that did not exist?
- Which codes should have been used instead of the MCCs at issue.
- The content or form of any query from CDI.
- Which claims CDI reviewed.
- Whether CDI review impacted whether an MCC was coded in any given claim.

Providence is left to attempt to fill these (and other) gaps in Relator's SAC.

To be clear, Relator itself cannot answer these questions because it knows so little about the claims at issue.  Relator has not alleged it reviewed a single medical record.  It does not purport to have any information about the patients, whether they had the diagnoses Providence coded, or whether physicians documented those diagnoses.  Relator's only hope to connect the dots between its data analysis and its legal conclusion of falsity is a review of medical records in discovery.  This is exactly the type of "complaint[ ] as a pretext for the discovery of unknown wrongs" that Rule 9(b) prohibits.  *Stac Elecs.*, 89 F.3d at 1405.

b.   Statistical Analysis With No Corresponding Claim Analysis Is Insufficient To Allege Falsity Under The FCA.

Relator's statistical analysis does not meet *Iqbal*'s plausibility requirement, much less the heightened pleading standards of Rule 9(b).  There is no legal support for the proposition that higher-than-average use of a billing code establishes that any individual claim using that code was fraudulent.  Providence is not aware of a single FCA case in which a relator or the Government relied on a provider's high

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

utilization of a code with no corresponding medical review.[16]  That Relator claims to have used similar methods to allege fraud in "mortgage-backed securities and other financial markets" is inapposite.  SAC ¶ 11.  Relator has not established why a methodology for analyzing financial markets is sufficient to plausibly allege healthcare fraud.  An allegation that individual medical claims did not represent the condition of the individual patients, such as the one here, requires an review of the condition of the patients that was allegedly misrepresented.  Relator, an outsider, has no information about the condition of Providence's patients.

Medicare does not even issue claims denials based on the types of statistical analyses Relator has performed.  Medicare contracts with companies to identify potential billing issues and recoup any improperly paid funds.  It instructs those entities to analyze Medicare data to identify providers that bill certain codes more than comparable providers.  The applicable manual instructs:

> Data Analysis is an essential *first step* in determining *whether* patterns of claims submissions and payments indicate

---

[16] FCA cases on statistical extrapolation are not on point.  In a statistical extrapolation case, the government reviews the medical records for a sample of patients, completes a holistic analysis of whether those claims were false, determines an error rate, and extrapolates the error rate to other claims in the population.  Here, Relators have not identified a single claim that was actually false, instead alleging that claims must be false because Providence billed certain codes more than Relator would expect.

Even among extrapolation cases, courts are split as to whether extrapolation can be used to prove falsity for claims for which the medical records were not actually reviewed.  *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, No. 0:12-3466-JFA, 2015 U.S. Dist. LEXIS 82379, at *18 (D.S.C. June 25, 2015) (refusing to allow sampling and extrapolation), *aff'd* 848 F.3d 330, 333 (4th Cir. 2017) (affirmed in part, but appeal dismissed as improper for interlocutory appeal on extrapolation); *United States ex rel. Wall v. Vista Hospice Care, Inc.*, No. 3:07-cv-00604-M, 2016 U.S. Dist. LEXIS 80160, at *42 (N.D. Tex. June 20, 2016) (refusing to allow extrapolation); *but see United States ex rel. Martin v. Life Care Ctrs. of Am., Inc*, 114 F. Supp. 3d 549 (E.D. Tenn. 2014) (allowing extrapolation).

*potential* problems.  Such data should include identification of statistical outliers in billing patterns within a well-defined group, or more sophisticated detection of patterns within claims or groups of claims that *might suggest* improper billing or payment.

PIM § 2.1.C (emphasis added).  Contractors are not entitled to deny any claims unless they review the relevant medical record and make a determination as to whether a particular claim was false.  *Id., see also* 42 C.F.R. § 410.32(d)(4) ("CMS does not deny a claim for services that exceed utilization parameters without reviewing all relevant documentation that is submitted with the claim…")

As Relator's allegations are not even enough to deny a claim, they are certainly not enough to initiate an FCA action, which threatens treble damages and per claim penalties.  Relator cannot survive Rule 9(b) when, in the words of CMS, its analysis "might suggest improper billing or payment."  PIM § 2.1.C.

### 2.     Relator Has Not Identified A Single Claim That Was False.

Relator spends nearly 13 pages listing "false claims," which appear to be a random selection of claims that coded one of the three MCCs at issue.  SAC, Tab. 3, 6, 9.  These are not "false claims;" they are just "claims."  Relator provides no information about how or why it selected these particular claims or how it separated the "false" claims from the appropriate claims.  With no facts, this Court should not accept Relator's legal conclusion that all claims with certain MCCs were false.  Relator fails to plead with particularity that any individual claim was false.[17]

---

[17] For the same reasons, Relator fails to allege that a false claim was actually submitted, which is another element of the FCA.  A false or fraudulent claim is "an essential element" of each of the FCA violations Relator alleges.  *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 335 (9th Cir. 2017) (as to 31 U.S.C. § 3729(a)(1)(A)); *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1047 (9th Cir. 2012) (as to 31 U.S.C. § 3729(a)(1)(B)); *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1056 (9th Cir. 2011) (as to 31 U.S.C. §

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

Relator's gross statistical analysis is not refined enough to state a claim with particularity. For this reason, amendment would be futile. No amount of statistical analysis will provide the necessary facts for pleading.

3.     <u>Relator Has Not Pleaded An "Objective Falsehood."</u>

Relator presumes that every time Providence coded an MCC, it received a higher reimbursement. SAC ¶ 122, n. 30 (calculating damages based on this assumption). This is incorrect. Under the MS-DRG system, there are up to three different levels of severity, depending on the primary diagnosis and whether one or more secondary diagnoses are present that qualify as an MCC or a CC and result in a higher payment. 72 Fed. Reg. at 47,158. For each DRG that has severity levels, there are a maximum of three payment rates. Providers can code between 1–24 secondary diagnoses, any number of which could be an MCC.[18] However, after the first MCC is coded, additional MCCs do not impact reimbursement. *Id.* As a result, if a claim has more than one MCC coded, removing an MCC does not change the amount Medicare would pay for the claim. For example, in the OIG Kwashiorkor Report, OIG found that, of the 90 claims that were allegedly improperly coded for kwashiorkor, only three impacted the DRG payment. This resulted in an overpayment of $12,516 of the total $2,868,197 paid for these claims (*i.e.*, .4%).

Relator does not seem to understand that MCCs do not always impact payment and, therefore, offers no allegation for how to determine whether removing an MCC might impact the payment on any individual claim. It does not allege whether any of the claims it identified coded additional MCCs. Providence is left guessing as to which claims are implicated by the SAC.

DRG upcoding cases that require this kind of guesswork do not meet the

---

3729(a)(1)(G).

[18] *See Hospital Acute Inpatient Services Payment System,* MedPAC (Oct. 2016), available at http://www.medpac.gov/docs/default-source/payment-basics/medpac_payment_basics_16_hospital_final.pdf (RJN, Ex. 1).

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

5693857.2

standard of Rule 9(b).[19]  In *Kernan Hospital*, the District of Maryland[20] dismissed a complaint that, much like the SAC, alleged that a hospital's CDI program and software lead to inappropriate coding for kwashiorkor.  880 F. Supp. 2d at 688.  The court found that, "if some Kwashiorkor coding would not result in higher reimbursement, then the Complaint utterly fails to explain under what circumstances the miscoding or upcoding of malnutrition *does* result in a false claim."  *Ibid.* (emphasis in original).  The court held that, "to state a claim under the Act in this case, the Government must describe *what* false statements were submitted to the government, and more importantly, *how* those submissions affected the hospital's reimbursement."  *Ibid.* (emphasis in original).

Relator has provided Providence with no information as to how to separate the correctly coded claims from the allegedly incorrectly coded claims.  Within the allegedly incorrectly coded claims, Relator has not alleged how to determine whether the MCC impacted reimbursement.  On both accounts, Relator has failed to allege the objective falsehoods that allegedly poisoned Providence's claims.

> 4.    Queries Do Not Violate the FCA.

Relator alleges that use of JATA's CDI methods and physician query tactics

---

[19] *See, e.g., United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 513 (6th Cir. 2007) (affirming dismissal of action alleging a DRG upcoding scheme because, while relator plead as to the specific codes that were "wrongly" billed, there were no allegations that any particular claim was submitted pursuant to the scheme); *United States ex rel. Atkins v. McInteer,* 470 F.3d 1350, 1358–59  (11th Cir. 2006) (affirming dismissal of upcoding case where relator cited particular patients, dates, and corresponding medical records but failed to allege false claims were actually submitted);  *Bennett,* 747 F. Supp. 2d at 781–83 (dismissing action where relator failed to plead which of contractor's employees encouraged upcoding or which physicians upcoded).

[20] Maryland operates under a Medicare waiver program, so Medicare claims are paid differently in that state than in the rest of the country.  However, the general principle – that coding a secondary diagnosis potentially increases reimbursement – applies in all states.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

5693857.2

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1  are responsible for Providence's high utilization of MCCs.  This fails under Rule

2  9(b) for three reasons.  First, Relator has not connected CDI activities to any actual

3  claims.  If CDI was not involved in a particular case (or at a particular hospital, or

4  during a particular time period), Relator's theory that CDI improperly influenced

5  coding necessarily fails.  A patient's claim would not be implicated by Providence's

6  alleged scheme if CDI never touched the claim.  Relator has not alleged about how

7  it determined which charts CDI reviewed or for which patients CDI issued physician

8  queries, which is fatal under Rule 9(b).

9        Second, Relator is incorrect in implying that CDI activities, including

10  reviewing charts and issuing physician queries to ensure that the hospital is fully

11  reimbursed for the care it provides, are somehow inherently suspect or nefarious.

12  *See* SAC ¶ 24 (taking issue with JATA's promise to "increase [a hospital's] Case

13  Mix Index through better documentation.").  CMS has explicitly rejected this

14  argument.  In the Preamble to the Final Rule implementing the MS-DRG system,

15  CMS noted:

16            [W]e believe it is important to address the notion in some

17            of the public comments that CMS believes changes in

18            how services are documented or coded that is consistent

19            with the medical record is inappropriate or otherwise

20            unethical.  We do not believe there is anything

21            inappropriate, unethical, or otherwise wrong with

22            hospitals taking full advantage of coding opportunities to

23            maximize Medicare payment that is supported by

24            documentation in the medical record.

25  72 Fed. Reg. at 47,180.  CMS then describes an article that found that a hospital that

26  adopted a CDI program "gained an additional $1.5 million in reimbursement" the

27  first year of the program and $900,000 the second year.  *Id.* at 47,182.  The hospital

28  was previously "leaving money on the table."  *Ibid.*  CMS expected that the new

5693857.2

1  MS-DRG system would create "additional opportunities to improve documentation

2  and coding" to achieve similar results.  *Ibid.*

3      Finally, Relators have not alleged that Providence's CDI programs failed to

4  fulfill any compliance obligations that would give rise to FCA liability.  Relator has

5  not alleged that Providence violated any statutory, regulatory, or contractual

6  requirements[21] with its CDI practices.  In fact, there is no CMS or other government

7  authority on the parameters of a CDI program or the form or process for issuing

8  queries.  Relator instead claims in an entirely conclusory fashion that Providence

9  issued leading queries that ran afoul of guidance from a non-governmental entity,

10  the American Health Information Management Association ("AHIMA").  But even

11  if Integra had plausibly pleaded that Providence failed to follow AHIMA guidelines,

12  which it did not, this would not render any claim false.  A relator cannot use the

13  FCA to enforce guidelines from a non-governmental third party.

14      **B.    An Invalid MCC That Does Not Impact Payment Is Not Material.**

15      To state a claim under the FCA, Relator must meet a "demanding" materiality

16  standard.  *Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989,

17  2003 (2016).  A false claim only triggers liability under the FCA when the falsity

18  would be material to the government's payment decision.  *United States ex rel.*

19  *Petratos v. Genentech Inc.*, 855 F.3d 481, 491–92 (3d Cir. 2017); *see also United*

20  *States ex rel. Martinez v. Orange Cty. Global Med. Ctr., Inc.*, No. 8:15-cv-01521-

21  JLS-DFM, 2017 U.S. Dist. LEXIS 221085 (C.D. Ca. Sept. 14, 2017).

22      As addressed above, coding an MCC does not necessarily change

23  reimbursement.  Even if a claim submitted with an incorrect MCC that did not

24  impact reimbursement were false (it is not), the falsity would not be material.

25  Though Relator baldly asserts that dozens of claims with particular MCCs were

26  "false claims," it makes no attempt to explain how it determined whether an MCC

27

28
        [21] Relator's references to "Medicare-compliant" queries is misleading because
there are no articulated Medicare compliance requirements for queries.  SAC FN 6.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1  impacted payment for that particular claim.

2      Relator fails to plead how it determined which MCCs actually impacted

3  payment.  *See* SAC ¶ 122, n. 30 (indicating that every use of an MCC impacted

4  payment which, as addressed above, is incorrect as a matter of law.)  As a result,

5  Relator has failed to specify with particularity which claims contained improper

6  MCCs that were material to the government's payment decision.

7      **C.    Relator's Allegations Give No Reasonable Inference That**

8          **Providence Knowingly Submitted False Claims.**

9      Relator's only reference to the FCA's scienter requirement is a copy of the

10  language of the FCA and AKS in its recitation of its causes of action.  SAC ¶¶ 132,

11  133, 138, 139.  Though Rule 9(b) does not require particularized allegations of

12  knowledge, even under Rule 12(b)(6), "threadbare recitals of a cause of action's

13  elements, supported by mere conclusory statements" do not have to be accepted as

14  true by a court in ruling on a motion to dismiss.  *Iqbal*, 556 U.S. at 678.  Relator's

15  allegations do not plausibly allege a knowing violation of the FCA.

16      Relator has failed to plead scienter because "[n]o facts alleged by relator[]

17  give rise to a reasonable inference that defendants were on notice they were filing

18  false claims."  *Modglin*, 114 F. Supp. 3d at 1024.  In *Modglin*, this Court found that

19  the relator failed to plead knowledge when he did "not cite to any Medicare statute,

20  regulation, NCD, LCD, or claim form" requiring the defendant make disclosures the

21  defendant failed to make.  *Ibid.*  As a result, the relator's allegations did not give

22  reasonable inference that the defendant was on notice that its claims were false.

23      Similarly, as addressed above, Relator cites no legal authority or guidelines

24  for CDI programs or queries that would put Providence on notice that its conduct

25  violated any statutory or regulatory requirements.  It pleads no other facts that would

26  show Providence had the requisite intent to submit false claims.  As a result,

27  Relator's claim must fail.

28  / / /

## VI.    THE CONSPIRACY AND REVERSE FCA CLAIMS FAIL AS DERIVATIVE OF THE INADEQUATE FCA ALLEGATIONS.

Because Relator has not made sufficient allegations to support a claim that Providence submitted false claims, Relator's conspiracy claim (SAC ¶ 132) and its claim under 31 U.S.C. § 3729(a)(1)(G) (the "Reverse FCA")  also necessarily fail. Relator's causes of action for conspiracy and under the Reverse FCA are derivative of its general FCA allegations; if the claims at issue were not false, Providence cannot be liable for conspiring to submit them or for retaining any payments it received for them.  The claims separately fail for the following reasons.

### A.    Relator Pleads No Facts To Support A Reverse FCA Claim.

Relator has not sufficiently alleged a Reverse FCA violation (SAC ¶ 131(c)) because it does not allege Providence "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or improperly avoids or decreases" such an obligation.  31 U.S.C. § 3729(a)(1)(G).  In cases, such as this one, in which a relator "alleges a reverse false claim by claiming that the defendant fraudulently overcharged the government and then failed to repay the government, courts have consistently dismissed the claim as redundant of false statement and presentment claims."  *United States v. Kinetic Concepts, Inc*., No. CV 08-01885-BRO (AGRx), 2017 U.S. Dist. LEXIS 221777, at *40 (C.D. Cal. Mar. 6, 2017) (citations omitted).  Otherwise, "whenever there is a violation under § 3729(a)(1)(A)…there would also be a violation of § (a)(1)(G)…which is not the intent of the statute."  *Id.* at 40–41.  Here, Relator has alleged no facts that would support a theory that Providence failed to repay the government, and this cause of action should be dismissed.

### B.    The Conspiracy Cause Of Action Should Be Dismissed Because Relator Fails To Allege Defendants Agreed To Violate The FCA.

The only allegation in the SAC pertaining to conspiracy is Relator's legal

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1   conclusion that "the Providence Defendants also conspired with JATA to defraud

2   the government, by knowingly and systematically falsifying claims…"  (SAC

3   ¶ 132).  This is decidedly not enough to sustain a conspiracy claim.

4        Courts apply general civil conspiracy principles to FCA conspiracy claims.

5   *Durcholz v. FKW Inc.*, 189 F.3d 542, 545 n.3 (7th Cir. 1999); *United States ex rel.*

6   *Rizzo v. Horizon Lines*, No. CV 10-7409 PA (AJWX), 2013 WL 12131171, at *4

7   (C.D. Cal. Oct. 28, 2013) (relying on *Durcholz*); *United States ex rel. Macias v. Pac.*

8   *Health Corp.*, No. CV 12-00960-RSWL-AJWx, 2018 U.S. Dist. LEXIS 27891, at

9   *28 (C.D. Cal. Feb. 20, 2018).  To state a claim for conspiracy under the FCA,

10  Relator "must plead that the alleged conspirators agreed to make use of a false

11  record or statement for the purpose of getting the government to pay a claim."

12  *Calisesi ex rel. United States v. Hot Chalk, Inc.*, No. CV-13-01150-PHX-NVW,

13  2015 U.S. Dist. LEXIS 57509, at *34 (D. Ariz. May 1, 2015).  A complaint fails to

14  allege conspiracy when it fails to plead "the existence of an unlawful agreement"

15  between the defendants.  *United States ex rel. Silingo v. Mobile Med. Examination*

16  *Servs.*, No. SA CV 13-1348 FMO (SHx), 2015 U.S. Dist. LEXIS 186860, at *28

17  (C.D. Cal. Sep. 29, 2015), *rev'd on other grounds*, 895 F.3d 619 (9th Cir. 2018).

18  Here, Relator has not alleged that the Defendants made any unlawful agreement to

19  violate the FCA.  For that reason alone, the claim fails and should be dismissed.

20       The claim independently fails because Relator does not allege Defendants

21  specifically intended to conspire.  Though a defendant can be held liable for

22  "knowingly" violating any of the other FCA provisions (*see* § 3729(a)(1)(A), (B),

23  (D), (E), (F), (G)), the conspiracy provision does not adopt the knowing standard.

24  § 3729(a)(1)(C).  Therefore, even a claim that alleges "deliberate ignorance" or

25  "reckless disregard"[22] would necessarily fail.  *United States v. Murphy*, 937 F.2d

26  1032, 1038-39 (6th Cir. 1991) (holding a defendant cannot be liable under

27

28  ───────────────
[22] The FCA defines "knowingly" as actual knowledge, deliberate ignorance, or
reckless disregard.  31 U.S.C. § 3729(b)(1).

1  § 3729(a)(1)(C) for "deliberate ignorance" or "reckless disregard"); *United States ex*

2  *rel. Johnson v. Shell Oil*, 183 F.R.D. 204, 208 (E.D. Tex. 1998) ("Indeed, the

3  conspiracy provision of the Act seems to require the specific intent to defraud,

4  unlike the other provisions which merely require knowledge.").

5       Thus, because it does not allege an agreement or a specific intent to conspire,

6  the SAC fails to state a claim with particularity under 31 U.S.C. § 3729(a)(1)(C),

7  and that cause of action (SAC ¶ 132) should be dismissed.

8  **VII.  RELATOR'S INCOMPREHENSIBLE KICKBACK CLAIM SHOULD**

9  **BE DISMISSED.**

10       The AKS prohibits the knowing and willful offering or solicitation of

11  remuneration in exchange for referrals of Medicare patients, or for arranging or

12  recommending the provision of services for which payment may be made by

13  Medicare.  42 U.S.C. § 1320a-7b(b).  Relator has not pleaded **any** of the required

14  elements for a kickback claim.  SAC ¶¶ 134–142.

15       Relator has not pleaded that JATA referred a single Medicare patient to

16  Providence, or the JATA recommended or arranged for the provision of any service

17  to a Medicare patient.  JATA is a consultant that Providence engaged "to help

18  support the system's compliance with clinical documentation management."  SAC ¶

19  3.  The SAC does not allege that JATA provided patients to Providence or made any

20  recommendations as to what services the hospital should provide.  To meet the

21  pleading standard, Relator must plead with specificity which patients JATA referred

22  to Providence for what remuneration, or which services for which patients JATA

23  recommended or arranged.  Relator had not set forth any such facts.

24       Even if JATA, as the SAC alleges, has guided Providence with respect to

25  MCCs to document in the medical records and include in Providence's Medicare

26  claims, this is clearly not the recommendation or arranging for the provision of any

27  particular services.  Rather, the services provided are ordered by the treating

28  physicians.  JATA at most provided advice concerning how to document and bill for

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1    services that a hospital and the treating physicians furnished, not as to which
2    services should be provided.

3    Further, Relator fails to allege other key elements, including that Providence
4    paid any remuneration for recommendations or referrals or that any such payments
5    were with the intent to induce the nonexistent referrals or recommendations.
6    Relator also fails to allege that any supposedly impermissible conduct was
7    "knowing and willful" as Relator does not allege the Providence was aware that it
8    had engaged in any unlawful conduct.

9    The cause of action is a non-sequitur and should be dismissed.

10   **VIII.  <u>CONCLUSION</u>**

11   This Court should dismiss Relator's SAC without providing it with at fourth
12   opportunity to draft an adequate pleading.  Relator's amendment would be futile,
13   especially in light of the fact that its claim is barred by the public disclosure bar.
14   Relator cannot survive the public disclosure bar because it is not an original source.
15   Relator is an outside data analytics firm with no relationship with any of the
16   Defendants.  It cannot plead facts to argue it was an insider.  To the extent that
17   Relator believes it can plead facts to survive a subsequent Motion to Dismiss, it
18   must state those facts in its opposition to allow Defendants to respond.

19   For the reasons addressed herein, Relator's claim should be dismissed without
20   leave to amend.

22   Dated:  October 23, 2018                HOOPER, LUNDY & BOOKMAN, P.C.

25                          By:   ___/s/  Lloyd A. Bookman___
26                                LLOYD A. BOOKMAN
                                  Attorneys for Defendants

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

5693857.2

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF SAN DIEGO**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Diego, State of California. My business address is 101 W. Broadway, Suite 1200, San Diego, CA 92101-3890.

On October 23, 2018, I served true copies of the following document(s) described as **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT** on the interested parties in this action as follows:

Jason H. Tokoro                         *Attorneys for Plaintiff/Relator*
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles. CA 90067

P. Jason Collins                        *Attorneys for Plaintiff/Relator*
Jeremy H. Wells
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Highway
Building C, Suite 300
Austin. TX  78746

Michael M. Maddigan                     *Attorneys for Defendant J.A. Thomas*
David W. Skaar                          *and Associates, Inc.*
Jessica L. Ellsworth
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 23, 2018, at San Diego, California.

_Valerie Hernandez_
Valerie Hernandez

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181